## Affidavit of Lauren Youngquist

I, Lauren Youngquist, state:

1.  I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS"), and have been so employed for approximately eighteen (18) years. While employed as an IRS Special Agent, I have been involved in numerous drug trafficking, tax evasion and money laundering investigations.

2.  I make this affidavit in support of a criminal complaint charging an attorney named LAWRENCE NOVAK with money laundering in violation of Title 18, U.S.C., § 1956. Section 1956(a)(3) is commonly referred to as a sting provision and makes it a crime to conduct a financial transaction involving money represented to be the proceeds of drug trafficking activity with the intent to: (1) promote the drug trafficking, (2) conceal or disguise, the source, ownership or control of the money, or (3) avoid a transaction reporting requirement under State or Federal law. The term "financial transaction" includes a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree. See Title 18, U.S.C., § 1956(c)(4).

3.  I also make this affidavit in support of a search warrant for NOVAK's home and office which are located at 235 Candy Lane, Brockton, Massachusetts.

4.  This affidavit is based on my personal involvement in

this investigation including information provided to me by other IRS and Federal Bureau of Investigation Special Agents who have participated in this investigation. This affidavit is also based on my review of IRS and FBI reports and audio recordings made during this investigation, and my conversations with cooperating witnesses.

5. This affidavit does not contain every detail of this investigation; rather, it contains those facts that I believe are necessary and sufficient: 1) to establish probable cause to believe that LAWRENCE NOVAK violated Title 18, United States Code, 1956, and 2) to establish probable cause for the requested search warrant.

## Identification of the Defendant

6. According to records from the Massachusetts Registry of Motor Vehicles, LAWRENCE NOVAK, date of birth June 12, 1951, resides at 235 Candy Lane in Brockton, Massachusetts. According to the MA Lawyers Diary and Manual, LAWRENCE NOVAK was admitted to the Massachusetts Bar in 1986. The address listed in the Massachusetts Lawyers Diary is 235 Candy Lane, Brockton, Massachusetts.

## The Location to be Searched

7. 235 Candy Lane, Brockton, Massachusetts. The location to be searched is a white-colored, center entrance house with black shutters and an attached two car garage on the right.

There is a brass plaque on the right side of the door.

## Summary of the Investigation

8. As explained below in more detail, the investigation concerns the activities of an attorney named LAWRENCE NOVAK who has offered to file false affidavits in court and launder drug proceeds on behalf of an individual who is cooperating with the FBI, the Drug Enforcement Administration and the IRS. That cooperating witness, Scott Holyoke, (hereinafter "the CW") was arrested by the Drug Enforcement Administration on federal drug trafficking charges and is currently detained prior to trial. NOVAK offered to have the CW sign false affidavits and file those affidavits in state court to invalidate some of the CW's prior state court convictions in order to reduce the CW's sentencing range under the federal sentencing guidelines. The CW agreed to sign the affidavits. He told NOVAK that he had over $100,000 in cash in a safe deposit box. The CW repeatedly told NOVAK that the money was drug proceeds. NOVAK told the CW that he would take approximately $60,000 of that money as a legal fee. NOVAK offered to launder, or to use NOVAK's words, "clean" or "cleanse" the remainder of the cash.

9. After NOVAK made the offer to launder the CW's drug proceeds, the IRS and FBI introduced an undercover IRS Special Agent ("the IRS UC") posing as the CW's aunt. The IRS UC gave NOVAK approximately $107,000 in cash, which the CW and IRS UC

represented to be the proceeds of drug trafficking activity. NOVAK agreed to deposit the cash into a bank account and give the IRS UC cashiers checks to disguise the source and ownership of the funds. On September 13, 2005, the IRS UC gave NOVAK $107,000 in cash. NOVAK took the money to Eastern Bank in Brockton, Massachusetts, obtained four cashiers checks, three in the amount of $9,000 and three $1,000 money orders. He then returned to his home and office where he was arrested.

### The Investigation

10. On or about June 27, 2005, the CW's mother (who is now cooperating with law enforcement) met with NOVAK and paid him $5,000 to assist the CW in getting his state convictions invalidated. In his pending federal case, the CW was and is also represented by the Federal Defender's Office in the District of Massachusetts. The meeting between the CW's mother and NOVAK took place at 235 Candy Lane, Brockton, Massachusetts. The CW's mother reported that she entered the house through the front entrance. While in the foyer, she noticed a room in the lower level of the house. She saw a large desk located in the center of the room. NOVAK brought her upstairs to the dining room where she gave NOVAK $5,000 to assist the CW in getting his state convictions invalidated.

11. In July 2005, the CW, who was incarcerated in Massachusetts as a federal pre-trial detainee, called NOVAK on

the telephone and discussed NOVAK working on his behalf to file affidavits to vacate his previous criminal convictions in Stoughton and Brockton, Massachusetts State District Courts. The CW did not report this contact with NOVAK or the scheme to file false affidavits until law enforcement officers confronted the CW about it. After law enforcement officers confronted the CW, the CW agreed to work in an undercover capacity.

12. On July 24, 2005, NOVAK went to the Massachusetts County Correctional Facility where the CW was incarcerated. Although NOVAK did not meet with the CW that day, NOVAK left two affidavits for the CW to review.

13. On July 31, 2005, NOVAK went to the Massachusetts County Correctional Facility where the CW was incarcerated and met with the CW to discuss the filing of the false affidavits. The CW consensually recorded the ensuing conversation. NOVAK and the CW discussed whether the state judge who presided over the CW's change of plea that is the basis of one of the CW's prior state convictions properly advised the CW of his rights before accepting the CW's guilty plea. A portion of the conversation between NOVAK and the CW went as follows:

CW: I'm positive that he [the state court judge] did though.
NOVAK: He doesn't remember. There are no tapes. Why do you care? Don't talk us out of this ...

CW:      Even though he did it, it doesn't matter?

NOVAK:   ... it doesn't matter.

14.   Later during the same meeting on July 31, 2005, the CW stated to NOVAK: "so but nobody's ever gonna find out about this matter. NOVAK responded: "The tapes don't exist. They can't prove it [the proper colloquy] was given."

15.   NOVAK and the CW also discussed how NOVAK was so successful in vacating prior state convictions. The exchange went as follows:

NOVAK:   Ninety percent of what I've done is -- you know, there's always one or two you can't do for somebody. You know what I'm saying?

CW:      Mm-hmm.

NOVAK:   And --

CW:      I wonder why. What is it? Is it because maybe the judge is still on the bench or whatever?

NOVAK:   Yeah, the judge is still on the bench.

CW:      So if the judge is off the bench, basically, you can do whatever you want?

NOVAK:   That's absolutely right.

CW:      Because nobody --

NOVAK:   Because nobody's there to defend his record.

16.   NOVAK and the CW also discussed NOVAK's fee to assist both the CW and the CW's brother who is also a federal defendant.

6

A portion of that discussion went as follows:

| | |
|---|---|
| NOVAK: | Do you -- what you ought to do is, you know -- so it's probably be $40,000.00 to $50,000.00. Is that something you can afford to do? |
| CW: | Yeah. It's -- it's all the drug money I -- it's all from the drugs. |
| NOVAK: | What do you care if you get out? I mean hell, you can always go make more money. |
| CW: | Yeah, exactly. But so what I wanted -- so what about both of us? What if both of us -- |
| NOVAK: | Sixty thousand, throw everybody in together. |
| CW: | You'll throw it together. You'd do those cases. |
| NOVAK: | I'll do his vacates. His case and your case for $60,000. |
| CW: | The only thing I'm worried about is how are you going get in front of the court? Because we can't say that I'm -- |
| NOVAK: | Hmm? |
| CW: | I can't say that I paid him. They investigate that stuff. |
| NOVAK: | Your family did. Your mother did. |
| CW: | She can't, because she's on probation. |
| NOVAK: | I'll say -- I'll figure that way out. Can you give -- |

7

| | |
|---|---|
| CW: | It's gonna be cash, because I had -- I didn't put it in the bank. It's in a safe deposit box. |
| NOVAK: | Okay. Who -- who's gonna deliver it? |
| CW: | Probably my mother or my uncle. |
| NOVAK: | When? |
| CW: | When? Whenever I figure it out, because she's got to go up and get it. |
| NOVAK: | I thought she went already. |
| CW: | No, she hasn't got the cash yet, because I wasn't sure. I wanted to talk to you about it, first. |
| NOVAK: | She brings it down. I'll file a notice of appearance. I'll just say I've known the family for years. |
| CW: | And that you're doing it pro bono? |
| NOVAK: | Right. |
| CW: | Okay. |
| NOVAK: | Okay. But have her -- it's got to be cash; no receipts. |
| CW: | No receipts. |
| NOVAK: | No receipts. I'll file both of them. I wanna file a motion this week, if she can come down this week, to get you before -- into a different program than you're in, into the Miller House. |

. . .

CW:       How are you gonna put that much money in the bank?

NOVAK:    I've got ways of doing it.

    17.  On August 21, 2005, NOVAK met the CW at the facility where the CW is incarcerated.  The CW again consensually recorded the conversation.  The meeting was arranged by NOVAK to inquire about the $60,000 the CW was to provide to NOVAK for legal fees.  During the conversation the CW stated that he had approximately $107,000 in the safe deposit box.  A portion of the conversation went as follows:

CW:       Yeah.  Well, the problem is, the reason why I didn't really want you to go up there, is because I have over $100,000 in there [the safe deposit box].

NOVAK:    Yeah, but you need to --

CW:       Okay, they don't let them in there.  They can't let them in there.

NOVAK:    You need to cleanse the money.

CW:       I know.  I know.  I know a cop that -- out there.  He --

NOVAK:    You need to put it in a client trust and have me cut her a check in 30 days, so she has a -- so it looks like she has the money.

CW:       Yeah, but how are we gonna do that?  That --

| | |
|---|---|
| NOVAK: | I put it in a client trust account, and I put it under a different name, probably. |
| CW: | Okay, yeah. |
| NOVAK: | A business name (unintelligible). |
| CW: | Yeah, okay. |
| NOVAK: | Then I give her a check, and then she can use that to help you. |
| CW: | What do you mean?  I don't get it. |
| NOVAK: | The thing -- you have $40,000 additional.  You pay me sixty. |
| CW: | Okay.  But I'm paying fifty. |
| NOVAK: | Right. |
| CW: | I got more than forty.  Probably like forty-seven.  I think it's like a hundred -- |
| NOVAK: | Okay.  Then you -- takes 30 days. |
| CW: | -- and -- because I've used some of it. |
| NOVAK: | Right.  Listen to me. |
| CW: | Okay. |
| NOVAK: | I'd cut her a check.  It's legitimate money in that. |
| CW: | Okay. |
| NOVAK: | Do you understand what I'm trying to say to you? |
| CW: | But I don't -- I don't get it.  You set up a trust account? |

NOVAK: Yeah, I put it in a client trust account. You don't have to disclose where it comes from.

CW: Oh.

NOVAK: That's a lawyer's (unintelligible).

CW: That's why I'm having it sit up there, because I don't know what the hell to do with it. I wanted to make it clean. That's the best way to do it?

NOVAK: It cleans the money.

CW: Yeah.

NOVAK: You need to clean the money, so she gets a check back.

CW: Yeah, but what if she gets -- even if she gets it, how are you gonna do it? Small installments or big ones?

NOVAK: Oh, no. I'm not gonna put it in all -- I'll put it in small installments. It's gonna take me 30 days.

CW: No, but I mean to give it back to her. Can you just give her --

NOVAK: No, I'm gonna give her a check or however she wants it. I could write a check for forty-seven, or if she wants it in small installments. Or if you need --

CW: But like if she gets a check for forty-seven and goes to cash it, they're gonna report it.

NOVAK:    But she doesn't want to cash it.

CW:       Yeah.

NOVAK:    She wants to keep -- you have to keep it under ten.

CW:       Yeah, so we'd have to --

NOVAK:    So I -- we could do ten -- do $9,000.00 a month, until she claims -- you know?

CW:       Yeah.

NOVAK:    And then it's in her checking -- savings account.

CW:       Yeah, because I use Brockton Credit Union, and I think she uses Brockton Trust.

NOVAK:    (Unintelligible).

CW:       Yeah.

NOVAK:    But they're not gonna say anything to me. I'm just gonna walk in.

CW:       Yeah. What bank do you use, normally?

NOVAK:    Easton -- Bank of Easton.

CW:       Oh, Bank of Easton? That's -- I've never even heard of that one.

NOVAK:    It's a small bank.

CW:       It's in Easton, Mass.?

NOVAK:    Yeah.

CW:       Oh, that's good. Yeah.

NOVAK:    That's (unintelligible).

CW:       So you can just transfer it over out of a trust

|||
|---|---|
| | account there, right? Is that how you do it? I don't get it. I don't know how to do it. |
| NOVAK: | You walk in and I -- |
| CW: | Explain it to me. |
| NOVAK: | I can put large amounts of cash into a -- |
| CW: | Because you're a lawyer? |
| NOVAK: | -- right, client/lawyer's trust account. And then if we have to do it in like $9,000 installments probably to your mother. |
| CW: | Yeah. |
| NOVAK: | Because otherwise, it's reported to the I.R.S. |
| CW: | Yeah. Hmm, that's the best way to do it? |
| NOVAK: | Right. |

18. NOVAK and the CW discussed the amount of money in the safe deposit box and whether there were drugs with the money. A portion of the conversation went as follows:

|||
|---|---|
| CW: | It's like -- I think it's like $107,000 |
| NOVAK: | $107,000? |
| CW: | She's taken some out for me to get, you know, a couple here, a couple there. To you know, but -- |
| NOVAK: | Does she -- she -- there's nothing else? There's no drugs or anything in that thing, right? |
| CW: | I have some pills in there. |
| NOVAK: | I don't need to know about those. |

13

CW:      Yeah.

NOVAK:   I don't want to know about them.

CW:      I know.

19.  On August 24, 2005, NOVAK met the CW at the Massachusetts facility where the CW is housed. The CW consensually recorded the conversation with NOVAK. During the meeting, NOVAK discussed the need to retrieve the CW's money from the safe deposit box before the "Feds" found the money and took it. NOVAK stated: "Your mother has to go up there and close it down and move anything that's in there..." The CW replied "... out of there." NOVAK responded "out of there. I'd leave a hundred bucks in there." NOVAK and the CW discussed how NOVAK would put the money into his client account and cut checks to the CW's mother in $9,000 increments. At one point the CW told NOVAK that his mother is nervous about handling "drug money." Also during the conversation, NOVAK made notes on the back of a file folder in which NOVAK maintained documents relating to the CW. According to the CW, the notes concerned the number of checks and the amount of each check that NOVAK intended to have made out to the CW's mother.

20.  On Sunday, September 11, 2005, NOVAK met with the CW at the Massachusetts correctional facility where the CW is housed. During a consensually recorded conversation between NOVAK and the CW, NOVAK confirmed that he planned to meet with

the CW's mother and the CW's aunt on Tuesday, September 13, 2005 at NOVAK's law office and receive $107,000 in cash from them. NOVAK said that he would open an account and deposit the cash. He would then obtain four bank checks which he would give to the CW's mother and the CW's aunt. The CW again told NOVAK that the $107,000 was "drug money" and that it came from selling "meth."

21. On September 13, 2005, the IRS UC, who was acting in an undercover capacity as the CW's aunt, and the CW's mother, who was also cooperating with IRS and the FBI, met with NOVAK at his home and law office at 235 Candy Lane, Brockton, Massachusetts ("235 Candy Lane".) NOVAK took them to the dining room which located on the upper level of the split level house. The IRS UC gave NOVAK $107,000 in cash which the IRS UC confirmed came from the safe deposit box that NOVAK and the CW had discussed.

22. NOVAK took the cash and brought it to Eastern Bank in Brockton, Massachusetts. An IRS Special Agent inside the Bank saw NOVAK at a teller window inside the Bank conducting some type of business. The Special Agent saw NOVAK leave the Bank. After NOVAK left the Bank the Special Agent confirmed that NOVAK had purchased three bank checks in the amount of $9,000 and three $1,000 money orders. NOVAK had deposited $77,000 into an existing account at the Bank. NOVAK returned to 235 Candy Lane where federal agents arrested him. A Bank employee told the IRS Special Agent that when NOVAK deposited the cash and purchased

the bank checks he stated, in substance, that he had found the money.

23. Eastern Bank is located at 1300 Belmont Street, Brockton, Massachusetts. According to the Federal Deposit Insurance Corporation, the Bank is FDIC insured. According to the Bank's website and public information offered by the Bank, the Bank does business in interstate commerce.

### Use Of A Taint Team

24. In identifying the items to be seized, every effort has been made to limit the scope of the warrant to only those matters which relate to the crime described above. While it is likely that items protected by the attorney-client privilege may be present at the premises, the documents relating to the CW and the money laundering crime are not privileged. Nevertheless, the following steps will be taken to avoid the disclosure of privileged information:

A. To summarize, the searching agents will be comprised of a team of agents from the FBI and IRS working under the direction of a "Team Leader." The searching agents will have no further role in the investigation of this matter and the case agents involved in this investigation will not participate in the search. In addition to the search team, there will be a Privilege AUSA and a Privilege Special Agent. The Privilege AUSA will be available to answer questions during the search, and the

Privilege Agent will take custody of the evidence obtained from the search. The Privilege AUSA will be from the U.S. Attorney's Office and will have no role in the further investigation and prosecution of this case. The Privilege Agent will be from the IRS and will have no role in the further investigation and prosecution of this case other than to serve as a Privilege Agent on other aspects of this case should the occasion present itself. Although the FBI and IRS case agents will be present at the premises to answer questions from the searching agents, they will not search any files in which there is any likelihood that privileged items may be found.

25. Based on the foregoing I believe there is probable cause to issue the requested Criminal Complaint and Search Warrant.

_____
Lauren Youngquist
Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn before me at Boston, Massachusetts, September 13, 2005.

_____
ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

17