UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES,                          )
                                        )
v.                                      )        Criminal Action No.  05-10260-RCL
                                        )
LAWRENCE NOVAK,                         )
                    Defendant.          )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

**I.  INTRODUCTION**

The defendant, Lawrence Novak ("Novak"), is a Massachusetts attorney charged with

two felony offenses against the United States.  Specifically, Novak has been indicted on one count

of endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503, and two counts of money

laundering, in violation of 18 U.S.C. § 1956(a)(3)(B) and (C).  He now moves to suppress

evidence against him on the ground that it is the fruit of the illegal interception of a telephone

conversation with his client, Scott Holyoke, who was, at the time, in pretrial detention at the

Barnstable County Jail (the "Jail").   For the reasons explained below, I GRANT the motion.

**II.  FACTS**

The following facts were developed at an evidentiary hearing on the motion held on

August 2, 2006.

In July, 2005, Holyoke was being prosecuted in this district on charges related to

methamphetamine trafficking, Hr'g Tr. 13, Aug. 2, 2006, and was being held in pretrial detention

at the Jail.  He was represented by Page Kelley of the Boston office of the Federal Defenders and

was cooperating with the government.  Hr'g Tr. 13-14; Affidavit of Lauren Youngquist.  In

contemplation of his approaching plea and sentencing, Holyoke sought to engage Novak to

vacate certain of his prior state convictions, so that his criminal history category, and thus the range of any period of incarceration under the Sentencing Guidelines, would be reduced.

The Jail employs a system that generally records all telephone calls made from the facility. The calls are not monitored in real time, but some are monitored randomly after they are recorded.  Hr'g Tr. 60.  The system is computerized, allowing an official of the jail to sort calls by inmate number and to see the telephone number called before listening to the call.  Hr'g Tr. 42-43.

Pursuant to state and federal regulations prohibiting the monitoring of inmates' properly placed calls to attorneys, the Jail requested that its telephone vendor, Securus,[1] develop a list of attorney telephone numbers for which inmate calls from the Jail would not be monitored.  Hr'g Tr. 71-73.  During the time relevant to this hearing, Securus used a database of attorney phone numbers from Info USA to construct this list.  Hr'g Tr. 71.[2]  If an inmate requested that Jail employees list a particular telephone number of an attorney as exempt from monitoring, the inmate was instructed to have his attorney contact Securus directly.  Upon request of the attorney, Securus would add the number provided by the attorney to the database of attorney numbers which would not be recorded.  Hr'g Tr. 45.  The regulations require only that calls to pre-authorized attorney numbers not be monitored, but Robert Ahonen, a lieutenant in the Barnstable County Sheriff's Office assigned to the Jail, testified that any number in the

---

[1]  At the time of the monitoring, Securus was called Evercom.

[2] Securus has subsequently switched to the directory of the state's Board of Bar Overseers ("BBO"), which provides a more accurate database of Massachusetts attorney numbers.  Hr'g Tr. 71-72.

*Massachusetts Lawyers Diary and Manual* ("*Lawyers Diary*") was a pre-authorized attorney number.  Hr'g Tr. 64-65.

Inmates of the Jail were informed generally that their phone calls were subject to monitoring.   Hr'g Ex. 5, 6.  They were generally not given any information about their right to have unmonitored attorney-client calls or the procedure for arranging for unmonitored calls to their attorneys.  Hr'g Ex. 5, 6.  The Jail does not have a written policy that addresses attorney-client phone calls.  Hr'g Tr. 57.  Although the Barnstable County Sheriff's Department Mail and Communication Policy distinguishes between non-privileged and privileged mail, the policy does not discuss privileged telephone calls, indicate whether attorney calls would be treated as confidential and therefore not recorded, or give any instruction as to  how a telephone call to an attorney could be made confidential.  Hr'g Ex. 5; Hr'g Tr. 51-52.  The Jail's Admission and Orientation policies similarly do not address whether attorney calls are treated as confidential or how to make them so.  Hr'g Ex. 6; Hr'g Tr. 53-55.  Nor does the inmate handbook address how to make telephone calls to attorneys confidential.  Hr'g Tr. 56, 61.  There is no evidence that Holyoke himself was ever informed whether or how attorney calls could be made confidential.  Hr'g Tr. 62.  Securus never publicized to either attorneys or inmates its policy for identifying attorney numbers, or that inmates or attorneys could request to have a number added to the database so that calls to that number would go unmonitored.  Hr'g Tr. 78.  Lieutenant Ahonen testified that he did not know how an inmate could discover that he would have to make a request to have an attorney listed as confidential.  Hr'g Tr. 38-39, 64.

3

In July 2005, Holyoke telephoned Novak at Novak's office.  Exhibits 3 and 4 are photographs representative of phones in the Jail, but not necessarily of the phone Holyoke used to call Novak.  Hr'g Tr. 44.  These exhibits depict a sign on the phones stating: "Calls are subject to monitoring and recording."  Hr'g Ex. 4.  At the time of the monitoring, Novak's office phone number was listed with BBO and in the *Lawyers' Diary*.  However, his phone number was apparently not part of Securus's list of attorney numbers, because the calls from Holyoke to Novak were recorded.

Over several days in July, 2005, Holyoke called Novak's office a total of six times.  Only in the last attempt did Holyoke actually speak with Novak; the other five times he spoke briefly with a person who apparently was Novak's secretary, Novak being unavailable.  At the beginning of each call an automated message was played; it advised that the call in progress was a collect call from an inmate at the Jail, and that: "This call is subject to monitoring and recording."  Both Holyoke and the secretary could hear this message.  At the beginning of the first call, the secretary answered the phone "Attorney Novak."  When Holyoke said he was calling for "Larry Novak," the secretary replied "The attorney isn't here right now, he's out to lunch."  During the third and fifth calls, the secretary told Holyoke that Novak was unavailable because he was meeting with a client.  Hr'g Ex. 2.

In the sixth call, Novak's secretary again answered.  The warning that the call was subject to monitoring played while the secretary was speaking to Holyoke.  The secretary then transferred the call to Novak.  The warning was not replayed, and Novak did not hear it when it was originally played.  After Novak and Holyoke  exchanged greetings, Novak's first question to Holyoke was "Do you know which cases you're talking about you need vacated?"  Thereafter,

4

Holyoke and Novak continued for several minutes to discuss the legal work that Holyoke wanted

Novak to perform.  Hr'g Ex. 2.

In July, 2005, Shawn Murray, a Massachusetts State Police Officer working on a DEA

Task Force, had been part of the team investigating Holyoke.  Hr'g Tr. 13.  As part of Murray's

ongoing investigation, he sent administrative subpoenas - - unsupervised by a judge or grand

jury - - to Barnstable requesting the Jail recordings of all phone calls made by Holyoke from

January 1, 2005 until July 7, 2005.  Hr'g Ex. 1; Hr'g Tr. 15-16.  Among such calls, were the calls

Holyoke made to Novak.  Neither Murray nor anyone else informed Holyoke in advance that the

federal authorities would be listening to the calls he made from the Jail as part of their continuing

investigation.  Hr'g Tr. 25.

Murray knew from the first call that Holyoke made to Novak's office that Holyoke was

calling an attorney's office.  Hr'g Tr. 29.  He could also tell from the sixth call that Holyoke was

attempting to engage Novak's services as an attorney.  Hr'g Tr. 21.  Murray knew that all six

calls were to the same number.  Hr'g Tr. 31-32.  However he never checked the number to see if

it was a listed attorney number.  Hr'g Tr. 29-31.

When Murray listened to the sixth call, he concluded from what he heard that Holyoke

was attempting to commit a crime by getting Novak to file false affidavits to vacate his prior

convictions.  Hr'g Tr. 21.  He therefore contacted Assistant United States Attorney Nancy Rue,

who then turned the investigation over to the public corruption unit of the U.S. Attorney's Office.

That office brought the FBI and the Internal Revenue Service into the investigation.  Hr'g Tr. 21-

22.  At this point, the government approached Holyoke to cooperate against Novak.  Hr'g Tr. 22.

While it is unclear whether the government used a carrot or a stick to secure Holyoke's

cooperation, it is clear that he was approached as a result of Murray's having listened to the recorded conversations between Holyoke and Novak.  Murray testified that he was not investigating Novak before he listened to the calls, and that, in fact, he had never heard of Novak before that time.  Hr'g Tr. 20.

In any event, with Holyoke's consent, given after Holyoke began to cooperate in the investigation of Novak, conversations Holyoke had with Novak in person and by telephone were recorded.  The government alleges that, during those conversations, Novak agreed to launder what he believed what the proceeds of drug trafficking and to accept $60,000 in drug proceeds for his efforts.

### III.  DISCUSSION

Asserting his rights under the Fourth Amendment, Novak moves to suppress all evidence pertaining to his initial conversation with Holyoke, described above, and all recordings and other evidence obtained following and resulting from that conversation.

The Fourth Amendment generally prohibits unreasonable searches or seizures.  U.S. Const. amend. IV.  "The protection afforded by the Fourth Amendment against searches and seizures 'governs not only the seizure of tangible items but extends as well to the recording of oral statements.'"  *Lonegan v. Hasty,* 436 F. Supp. 2d 419, 433 (E.D.N.Y. 2006) (quoting *Katz v. United States,* 389 U.S. 347, 353 (1967))  Warrantless searches are presumptively unreasonable. *United States v. Cruz Jimenez*, 894 F.2d 1, 5 (1st Cir. 1990).  No warrant was obtained for the recording of the initial telephone conversation between Novak and Holyoke.  Thus, the relevant questions are whether Novak had a reasonable expectation of privacy in that conversation, and, if

so, whether the recording of the conversation was justified by a recognized exception to the warrant requirement.  *See id.*

### A.  Reasonable Expectation of Privacy

The first question raised by Novak's Fourth Amendment claim is whether Novak had a reasonable expectation of privacy in his phone call with Holyoke.  *See United States v. Jimenez*, 419 F.3d 34, 40 (1st Cir. 2005) ("Whether the Fourth Amendment's prohibition against unreasonable searches and seizures has been violated depends on whether the person asserting a Fourth Amendment violation had a reasonable expectation of privacy in the place searched or the thing seized.") (quoting *United States v. Thornley*, 707 F.2d 622, 624 (1st Cir. 1983)).  There is "a two-step test for determining whether a reasonable expectation of privacy exists: whether the individual has exhibited a subjective expectation; and whether such subjective expectation, viewed objectively, is justifiable under the circumstances.  The burden is on the defendant to satisfy these two tests."  *Thornley*, 707 F.2d at 624 (citations omitted).

Novak has satisfied the subjective test.  In an affidavit filed in support of the present motion, he says: "I regularly receive calls from clients who are incarcerated in various detention facilities in the Commonwealth of Massachusetts.... I accept these calls as an attorney and discuss attorney-client matters with my clients.... I have always believed that my telephone calls with my clients were neither monitored nor recorded."  Affidavit of Lawrence Novak In Support of Motion to Suppress, ¶¶ 4-6.

The question now raised is whether Novak's subjective expectation, viewed objectively, was reasonable.  Determination of this question requires particularized consideration of the totality of the circumstances.  *See Katz*, 389 U.S. at 351.  ("[T]he Fourth Amendment protects

people, not places.  What a person knowingly exposes to the public, even in his own home or

office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as

private, even in an area accessible to the public, may be constitutionally protected.") (citations

omitted).

      The initial telephone conversation between Novak and Holyoke, as noted above,

concerned legal matters as to which Holyoke desired representation by Novak.  For that reason,  I

conclude that Novak's expectation of privacy in that conversation was reasonable.  *See Lonegan*,

436 F. Supp. 2d at 434-36 (denying motion to dismiss because attorneys had a reasonable

expectation of privacy in conversations with pre-trial detainee clients in prison setting); *In re State*

*Police Litig.*, 888 F. Supp. 1235, 1255-56 (D. Conn. 1995) (noting that parties have a reasonable

expectation of privacy in privileged attorney-client calls made from a police station).  In the

circumstances of this case, the value placed on the confidentiality of attorney-client

communications, even for prisoners, was reflected in practice.  Although there was at the Jail a

general practice of monitoring calls made by inmates, that practice excepted attorney-client calls.

Both federal and state regulations exempt from monitoring properly placed attorney-client calls.

28 C.F.R. § 540.102 (2006) ("Staff may not monitor an inmate's properly placed call to an

attorney.  The Warden shall notify an inmate of the proper procedures to have an unmonitored

telephone conversation with an attorney."); 103 Mass. Code Regs. 482.08 (2006) ("Telephone

calls to pre-authorized attorney numbers shall not be subject to telephone monitoring or

recording").

      Courts have also recognized the need to preserve the confidentiality of conversations

between inmates and their attorneys.  *See, e.g., Mann v. Reynolds*, 46 F.3d 1055, 1060-61 (10th

Cir. 1995) (striking down prison policy barring full contact visits between death row inmates and

their attorneys as an unjustified limitation on inmates' meaningful access to attorneys and the

courts); *Ching v. Lewis*, 895 F.2d 608, 609-10 (9th Cir. 1990) (holding that, where contact visit

between inmate and attorney was necessary for confidential in-person communications,

inmate had a right to such a visit, notwithstanding his ability to communicate confidentially with

his attorney through mail or over telephone); *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir.

1974) ("An inmate's need for confidentiality in his communications with attorneys . . . is

particularly important.  We think that contact with an attorney and the opportunity to

communicate privately is a vital ingredient to the effective assistance of counsel and access to the

courts"); *Al Odah v. United States*, 346 F. Supp. 2d 1, 15 (D.D.C. 2004) (denying government

request to monitor consultations between Guantanamo detainees and their attorneys as

impermissible burden on attorney-client relationship).

     This societal recognition of the need for confidential communications between attorneys

and clients is also expressed in the attorney-client privilege itself.  *See Swidler & Berlin v. United

States*, 524 U.S. 399, 403 (1998) ("The attorney-client privilege is one of the oldest recognized

privileges for confidential communications.  The privilege is intended to encourage 'full and frank

communication between attorneys and their clients and thereby promote broader public interests

in the observance of law and the administration of justice.'") (quoting *Upjohn Co. v. United

States*, 449 U.S. 383, 389 (1981)).  In the criminal context, the privilege has constitutional

dimensions, because the intrusion into confidential attorney-client communications can constitute

a violation of the client's Sixth Amendment rights.  *See United States v. Mastroianni*, 749 F.2d

900, 905-08 (1st Cir. 1984) (explaining circumstances under which intrusion by state into

confidential attorney-client meeting will violate client's Sixth Amendment rights); *see also Wolff v. McDonnell*, 418 U.S. 539, 576 (1974) ("[T]he Sixth Amendment . . . protect[s] the attorney-client relationship from intrusion in the criminal setting").  Although the privilege exists to protect the client, not the attorney, its existence encourages both parties' expectation of privacy in communications between them.  *See Lonegan,* 436 F.Supp at 435.  Because the prisoner client's contact with an attorney and the opportunity to communicate privately "is a vital ingredient to the effective assistance of counsel and access to the courts," *Bach*, 504 F.2d at 1102, it is reasonable for *both* the client and the attorney to expect that conversations between them will not be monitored.

In apparent recognition of the traditional sanctity of conversations between attorney and client and the requirements of state regulations, in this case, the Jail attempted to exempt attorney-client calls from its general monitoring procedure.  The attempt, however, was poorly executed.  First, as noted above, Securus, using a database of Massachusetts attorneys, created a list of telephone numbers that were to be exempt from monitoring.  The list was flawed because it did not include Novak's telephone number, despite the fact that Novak's number was listed in the *Lawyers' Diary*.  Second, the evidence establishes that there was essentially no communication, either to inmates or to attorneys, of the Jail's policy regarding the exemption from monitoring of attorney-client calls, or the procedure that the Jail used to identify attorney phone numbers so as to exempt them from monitoring.  Because the calls to Novak's office were answered by his secretary, and routed to Novak after the warning message was received, Novak did not hear the warning of potential monitoring played at the beginning of the phone call.  He therefore was not

10

placed on notice that his normal expectation of confidentiality might be different with respect to the call from Holyoke.[3]

Although courts have generally concluded that neither an inmate (including a pretrial detainee) nor a person who knowingly receives a call from the inmate has a reasonable expectation of privacy in telephone calls between them, *see, e.g., United States v. Footman,* 215 F.3d 145, 155 (1st Cir. 2000); *United States v. Willoughby*, 860 F.2d 15, 21-22 (2d Cir. 1988); *United States v. Correa*, 220 F. Supp. 2d 61, 63 n.2 (D. Mass. 2002); *United States v. Peoples*, 71 F. Supp. 2d 967, 977 n.14 (W.D. Mo. 1999); *United States v. Harrison*, 986 F. Supp. 280, 281 (M.D. Pa. 1997); *United States v. Cheely*, 814 F. Supp. 1430, 1439 (D. Alaska 1992), none of these cases involved calls between inmates and their attorneys.  Indeed, federal and state laws and regulations generally authorize the monitoring of inmates calls in the interest of security.  *See, e.g., Willoughby*, 860 F.2d at 21-22.   The analysis is turned on its head in the case of an attorney-client call, because monitoring of those calls is expressly prohibited by these same regulations.  In addition, one justification for finding that inmates have no reasonable expectation of privacy in their telephone calls is that, balancing the institution's need to maintain order and safety against the reduced right to privacy of inmates, the monitoring of prisoners' phone calls generally is not

---

[3]  This is not to imply that, by notifying Novak in advance of its intent to monitor the phone call, without more, the prison could nullify Novak's reasonable expectation of privacy in the call.  As noted earlier, "the 'controlling' inquiry where an expectation of privacy is challenged is whether the expectation is one 'society is prepared to recognize as reasonable,'" rather than whether a subjective expectation of privacy existed.  *Blackburn v. Snow*, 771 F.2d 556, 563 (1st Cir. 1985) (quoting *Hudson v. Palmer*, 468 U.S. 517, 525 & n.7 (1984)).  Were it otherwise, the government could render the Fourth Amendment a dead letter simply by informing everyone in advance of its intention to disregard the Amendment's constraints.  *See Blackburn*, 771 F.2d at 563 & n.4 (citing Anthony Amsterdam, *Perspectives on the Fourth Amendment*, 58 MINN. L. REV. 349, 384 (1974)).

unreasonable.  *See Willoughby*, 860 F.2d at 21.  In the case of attorney-client communications,

the balancing of the institution's need for security against the inmate's privacy interest tilts heavily

in favor of the inmate's privacy interest.  *Cf. Lanza v. New York,* 370 U.S. 139, 143-44 (1962)

("It may be assumed that even in a jail, or perhaps especially there, the relationships which the law

has endowed with particularized confidentiality must continue to receive unceasing protection.")

Accordingly, for the reasons stated above, I hold that Novak has satisfied both the

subjective and the objective tests for a reasonable expectation of privacy in his initial conversation

with Holyoke.[4]

## 2.  Consent

Notwithstanding Novak's reasonable expectation of privacy in his initial telephone

conversation with Holyoke, the monitoring of that communication would not violate the Fourth

Amendment so long as one party consented to it.  *See United States v. Miller*, 720 F.2d 227, 228

(1st Cir. 1983) (listening to and/or recording telephone conversation with consent of one party to

the call does not violate Fourth Amendment); *see also United States v. White*, 401 U.S. 745, 751

(1971) (plurality opinion) (person who is lawfully listening to a conversation may simultaneously

---

[4]  The government offers a number of reasons which it says indicate that the attorney-client privilege would not exclude the recorded conversation in question here.  First, it argues that the privilege belongs to the client, *see United States v. Rakes*, 136 F.3d 1, 3 (1st Cir. 1998), and that it has been waived by Holyoke.  Second, it asserts that Holyoke had not yet actually engaged Novak, an argument that fails because the privilege covers prospective clients seeking legal advice, *see United States v. Wilson*, 798 F.2d 509, 512 (1st Cir. 1986).  Third, the government argues the crime fraud exception applies, *see Rakes*, 136 F.3d at 4 (1st Cir. 1998).  None of these arguments can carry the day because the question is *not* whether attorney-client privilege shields these communications; rather, the question is whether in the totality of the circumstances here, including the existence of the privilege *in general*, Holyoke and Novak had a reasonable expectation of privacy in the telephone call between them such that intrusions into that privacy raise Fourth Amendment concerns.

radio that conversation to others and record the conversation without violating the Fourth Amendment).   The government argues that Holyoke consented to the monitoring of the telephone call in question, because "he placed a call on a phone line he knew was monitored."   Brief of the United States in Opposition  to the Motion to Dismiss at 9.

"It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was 'freely and voluntarily given;' there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority."  *United States v. Perez-Montanez*, 202 F.3d 434, 438 (1st Cir. 2000) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.'" *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973)).   "Free and unrestrained choice" in the context of consent to search denotes a conscious decision to surrender Fourth Amendment protections, made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see United States v. Marshall*, 348 F.3d 281, 285-86 (1st Cir. 2003) (proof of valid consent requires a showing that consent was "knowingly, intelligently, and voluntarily given").   Both the existence of consent and its voluntariness are questions of fact, determined from the totality of the circumstances.  *United States v. Winston*, 444 F.3d 115, 121 (1st Cir. 2006).  Among the factors of which a court should take account in determining whether voluntary consent to a search was given are the "age, education, experience,  [and] *knowledge of the right to withhold consent*."  *Marshall,* 348 F.3d at 286. (emphasis added).

13

There is no evidence of explicit consent to the monitoring from either Novak or Holyoke. Rather, the government argues that Holyoke's use of the telephone – after he presumably saw the notice posted on the phone and heard the warning played at the beginning of the call – constituted implied consent.  The Fourth Amendment's consent exception to the warrant requirement can be satisfied by implied consent.  *See Winston*, 444 F.3d at 121.

What the record shows in this case is that Holyoke spoke to Novak, with apparent candor, after having heard six times the warning that the call was monitored.  The government's position is that the reasonable inference to draw from these circumstances is that, in proceeding with the conversation, Holyoke consented to the monitoring.  *See Griggs-Ryan v. Smith*, 904 F.2d 112, 118 (1st Cir. 1990) ( plaintiff " knowingly agreed to the surveillance" by his landlady of his incoming phone calls, for purposes of the  Federal Wiretap Statute, where he spoke unguardedly on the landlady's personal line after receiving numerous warnings that incoming calls were being recorded by her).  But for two other considerations, the government's position here would be a sound one.

First, although the Jail had a policy of monitoring outgoing phone calls generally, the call in question here between attorney and client should not have been monitored.  Indeed by both federal and state regulation, calls between an inmate of the Jail and his attorney generally are exempt from monitoring.  Novak's office telephone number was not included in the list of exempt numbers only because of an apparent glitch in the procedures the Jail employed to avoid the monitoring of attorney-client calls.

Second, even if the system of automatic exemption of attorney-client calls failed, as it did in this case, the Jail had procedures by which an inmate could arrange to exempt from monitoring

14

calls he made to his attorney.  The problem, however, is that inmates at the Jail were never

informed of either their ability to exempt attorney-client calls from the general telephone

monitoring or the procedure for doing so, and the government offered no evidence in this case

that Holyoke knew that he could arrange to have unmonitored conversations with Novak.  Thus,

it is not possible for me to conclude, as the government argues, that because Holyoke proceeded

to speak to Novak in the face of the warning about being monitored, he consented to the

monitoring.

     Not every action is the result of a knowing, intelligent and voluntary choice.  It may

simply be that Holyoke believed that there was no other option than to have the conversation

monitored if he wished to talk to Novak by telephone.  If that were Holyoke's state of mind, at

the time of the conversation in question, this case would be of the kind in which: "[i]t may

reasonably be argued that 'implied consent' in this sense is not a free and voluntary consent; it is

instead no more than a choice between unattractive options...."  *Langton v. Hogan*, 71 F.3d 930,

936 (1st Cir. 1995) (collecting cases from other jurisdictions suggesting that consent under

federal and state wiretap laws may be implied where an inmate acknowledges in writing his

understanding that all calls he makes will be monitored, even if executing the written

acknowledgment is a condition of making the call in the first place).  Of course, I need not decide

the consent question here on the basis that Holyoke had only a choice between a monitored

conversation with Novak and no conversation at all.  He had a third choice, namely to have this

and all other conversations with Novak exempted from monitoring.  What the government has not

shown, however – as I believe it must show – is that Novak knew (or at least that he should have

known) that he had this third option, and that with full awareness of all his options, Holyoke

15

chose to proceed with the communication.  *Cf. Rosario-Diaz,* 202 F.3d at 69 (to establish consent

to a search, government bears burden of demonstrating consent was product of a "free and

deliberate choice," made with "full awareness of the nature of the right being abandoned and the

consequences of the decision to abandon").  Without that showing, I cannot determine whether

Holyoke in fact spoke to Novak as a matter of free and unrestrained choice, *See Chhien,* 266 F.3d

at 7, or whether his doing so was "mere acquiescence in the face of an unfounded claim of present

lawful authority."  *Perez-Montanez*, 202 F.3d at 438 (1st Cir. 2000).[5]  In short, I find that the

government has not met its burden of establishing that Holyoke consented to the monitoring of his

initial conversation with Novak.[6]

---

[5] The decision of the First Circuit in *United States v. Footman*, 215 F.3d 145 (1st Cir. 2006), does not compel a contrary result.  *Footman,* decided under the Federal Wiretap Statute, held that a prisoner who made a phone call to a non-attorney with the knowledge that the call was subject to monitoring impliedly consented to the monitoring, even though the prisoner had no option to make a telephone call not subject to monitoring.  *Id.* at 155.  The court noted that, by Massachusetts regulation, all inmate calls, "*except calls to designated attorneys*" were subject to monitoring and that "[p]rison inmates have few expectations of privacy in their communications." *Id.* at 154-55. (emphasis added)  One of the few areas where inmates have a reasonable expectation of privacy, however, is in their communications with their attorneys.  *See Lonegan,* 436 F. Supp. 2d at 434-435.  *Footman,* then, is distinguishable from this case, because the communications in *Footman* were between an inmate and a person who was not the inmate's attorney.  Here, the communication in question should have been exempt from the Jail's monitoring program, because the communication was between an inmate and his attorney.

[6] The government argues that the fact that Holyoke has not moved to suppress the statements indicates that he consented to the monitoring.  First, that Holyoke has presumably determined that his interests are better served by cooperating with the government than by vigorously asserting his constitutional rights does not mean that he does not have any rights to assert.  Second, the fact that Holyoke is cooperating against Novak works against the government.  The fact that the government did not call him to testify at the suppression hearing, particularly as to the consent question, invites the inference that Holyoke's testimony would not be helpful to the government.

## IV.  CONCLUSION

Novak had a privacy interest in the initial telephone conversation he had with Holyoke, and that privacy interest was protected by the Fourth Amendment.  The conversation should never have been recorded, but once recorded, Murray should have refrained from listening to it. In the absence of a warrant to monitor the conversation, the government has argued that one of the parties, Holyoke, consented to the monitoring.  The government, however, has failed to demonstrate that consent was freely given by Holyoke with full awareness of his options to have a confidential conversation with his attorney.  Accordingly, any evidence obtained from, following, and as a consequence of, the monitoring of the initial conversation between Novak and Holyoke was unlawfully obtained and hereby is suppressed.  *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (evidence obtained "by exploitation of [the primary] illegality" is fruit of the poisonous tree and may not be used against defendant at trial).

SO ORDERED.

/s/ REGINALD C. LINDSAY
United State District Judge

DATED: September 26, 2006

17